

**FILED**

Sep 27 2023, 8:43 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Valerie K. Boots
Marion County Public Defender Agency
Indianapolis, Indiana

Susan D. Rayl
Harshman Ponist Smith & Rayl
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Daylon L. Welliver
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Harry L. Torrence, II,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | September 27, 2023<br><br>Court of Appeals Case No.<br>22A-CR-2287<br><br>Appeal from the<br>Marion Superior Court<br><br>The Honorable<br>Matthew E. Symons, Magistrate<br><br>Trial Court Cause No.<br>49D29-2011-F3-35395 |

**Opinion by Senior Judge Robb**
Chief Judge Altice and Judge Bailey concur.

**Robb, Senior Judge.**

## Case Summary and Issue

[1] After a jury trial, Harry L. Torrence, II was found guilty of one count of Level 3 felony robbery with a deadly weapon.[1] Torrence appeals, arguing that the trial court committed fundamental error by allowing the jury, during deliberations, to view in open court four specifically requested exhibits instead of viewing all of the exhibits. Concluding no error, let alone fundamental error, occurred, we affirm.

## Facts and Procedural History

[2] At around 7:45 p.m. on November 6, 2020, Kareem Limberry and his manager were working at a Family Dollar Store in Indianapolis, when two male customers entered the store. One of the men came behind the counter, pointed a gun at Limberry's head, and demanded that he open the cash register. That man was wearing a navy "letterman" jacket with white sleeves, a hood and stocking cap, and a "COVID mask." Tr. Vol. II, pp. 128, 141-42. When the mask became partially dislodged, Limberry observed that the man had dark skin and gold teeth. Police subsequently showed Limberry a photographic array from which he identified either person number one or person number three as the man who had held the gun to his head. Torrence was person number three in the array.

---

[1] Ind. Code § 35-42-5-1(a) (2017).

[3]     Recordings from video cameras in the store and still shots from the video recordings showed a man wearing a letterman jacket place his hand on the glass portion of a door near a label or sign. Another still shot showed the man in the letterman jacket standing in the foreground of the picture. That person was the person who held the gun to Limberry's head.

[4]     After Limberry opened the register, the man with the gun took the cash from the register, while the other man came behind the counter and took cigars and packs of Newport cigarettes. The money had a tracking device in it, which alerted police once the tracking device left the store.

[5]     Information about the location, direction, and relative speed at which the tracker was travelling was dispatched to IMPD officers. Officer Richard Faulkner responded and located a dark colored car in the middle of the street with the passenger door open and a male standing outside on that side of the car. The male appeared to be stomping on something.

[6]     When Officer Faulkner activated his patrol car's red and blue lights the passenger immediately jumped in the car, both doors shut, and the car drove away. The car moved only "a matter of yards" before it came to a stop and the driver and the passenger "bail[ed]." *Id.* at 199, 209. The driver was a black male with a jacket that appeared to be black with light-colored sleeves "like a letterman jacket." *Id.* at 199. The driver ran away and climbed over a six-foot privacy fence.

[7] Officer Faulkner testified that the person who was shown in one of the still shots wearing a jacket with white sleeves had the same kind of jacket the driver was wearing. However, Faulkner could not see the faces of the driver and his passenger as they fled, and he was unable to positively identify the person in the still photographs from the store video as the driver of the vehicle.

[8] Officer Faulkner ran up to the car after the driver and passenger fled and remained there. The engine of the car was running and the doors were open. He looked inside the car and saw a gun, some cash, and cigarettes. The money and gun were located on the driver's side floorboard, and sealed packs of Newport cigarettes were in the center console and passenger front seat area. The gun was a small black handgun, which later was determined to have five bullets in the magazine and one bullet in the chamber. A black "COVID mask" with a white logo on it was found near the doorframe and seat on the driver's side of the car. Tr. Vol. III, p. 8.

[9] Officer Faulkner checked the license plate and VIN number of the car with the Bureau of Motor Vehicles and learned that Torrence was the owner of the car. Torrence subsequently admitted at trial that the car was his.

[10] IMPD Officer Brian Willis, an evidence technician, processed the vehicle and secured evidence. He found a debit card and a license issued by the Indiana Department of Environmental Management in the center console bearing the name Harry Torrence. Torrence subsequently admitted the cards belonged to

him. The tracking device from the money taken from the store was also recovered from the car.

[11] Officer Willis also found identification cards for "Albert White" in the glove box of the vehicle. He collected fingerprints that were found on the Newport cigarette packages and the outside door handle of the front passenger door. Amber Timmerman, who was a latent print examiner for IMPD, testified that the fingerprints on the packages and the door handle matched those of Albert White. Torrence testified that he knew Albert White because they had grown up in the same community, but he knew him as "Pooh." *Id.* at 95.

[12] Family Dollar Store Manager Jennifer Samson testified that it was store policy to clean the doors every night at 6:00 p.m. because robberies are more likely to occur from 6:00 p.m. until closing. Samson said that she cleaned the doors, door handles, and windows that evening pursuant to that policy. Timmerman testified that fingerprints are fragile and can be "easily wiped away, cleaned off." *Id.* at 46.

[13] Officer Craig Wagoner, a patrol officer and evidence technician, reviewed the store's security camera video, saw where the person in the still shots touched the door, and recovered a latent palm print "from that particular spot." *Id.* at 36; Ex. Vol. I, St. Exs. 5, 10. The palm print matched Torrence's palm print.

[14] The State charged Torrence with one count of Level 3 felony robbery with a deadly weapon. At trial, Limberry was unable to identify Torrence as the man who held the gun to his head. However, Detective Jordan Agresta compared

Torrence's BMV photograph with the store video and concluded that it was the same person. Agresta also testified that the mask shown in the video was the same mask that was recovered from the driver's side of the car.

[15] The State introduced the store video, and two still shot images captured from the video were introduced as State's Exhibits 5 and 6. Those exhibits depicted the man in the letterman jacket who had held the gun to Limberry's head. The exhibits were admitted and published to the jury. State's Exhibit 35, a card that contained the latent palm print Wagoner had collected from the store's glass door, also contained a "crude" diagram Wagoner had drawn, describing the location from which he obtained the print. Tr. Vol. III, p. 38. Wagoner also testified, demonstrating where he had taken the print through reference to State's Exhibit 5, which included a physical indication on the displayed image. However, Wagoner testified that he could not "definitively" say that the prints were placed on the door the day of the crime. *Id.* at 40.

[16] State's Exhibit 36 was a palm print Timmerman took from Torrence. That palm print matched the latent palm print recovered by Wagoner from the door of the store. The exhibit was admitted and published to the jury. Timmerman testified that she could not say how long Torrence's print had been on the door.

[17] After the presentation of evidence, but prior to closing arguments, jurors were permitted to come to the court room to view the exhibits one more time by agreement of the parties. The jury began deliberating and then sent a note to the trial court asking, "can we see State['s] Exhibit[s] 5, 6, 35, 36." Appellant's

App. Vol. II, p. 178. The trial court suggested that they "bring them—the jury in and then pass it to them and let them look at it for as long as each juror would like to and then send them back to continue their deliberations." Tr. Vol. III, pp. 126-27. The trial court asked Torrence if he had "[a]ny objection" to which he replied "[t]hat's fine." *Id.* at 127.

[18] The jurors were brought back into open court where they were seated and allowed to review State's Exhibits 5, 6, 35, and 36 in the presence of the court and the parties. The jury then resumed deliberations and ultimately found Torrence guilty as charged.

## Discussion and Decision

[19] The sole issue Torrence raises for our review is whether the court committed fundamental error by allowing the jury, during deliberations, to view in open court four specifically requested exhibits instead of viewing all of the exhibits.

[20] Once the jury begins deliberations, Indiana Code section 34-36-1-6 (1998) outlines the procedure for handling disagreement among jurors as to any part of the testimony or if the jury requests to be informed on any point of law arising in the case. Here, there was no expression of disagreement. The jury simply asked to view four specific exhibits one more time. Consequently, the statutory procedure does not apply.

[21] Next, we turn to case law, which provides that the decision to allow the jury to view the exhibits one more time is left to the discretion of the trial court. *See Stokes v. State*, 801 N.E.2d 1263, 1269 (Ind. Ct. App. 2004) (decision to allow

jury to view evidence again within trial court discretion), *trans. denied.* The case law sets forth three factors a court should consider in deciding whether to permit the jury to take a copy of the exhibits into the *jury room.* *Thacker v. State*, 709 N.E.2d 3, 7 (Ind. 1999) (emphasis added). Those factors are: "(1) whether the material will aid the jury in a proper consideration of the case; (2) whether any party will be unduly prejudiced by submission of the material; and (3) whether the material may be subjected to improper use by the jury." *Id.*

[22] Here, however, we have the situation where both parties were present in *open court* while the trial court directed the distribution of the requested exhibits to the jurors and monitored their review. In *Sturma v. State*, 683 N.E.2d 606, 610 (Ind. Ct. App. 1997), we found no error where the trial court monitored the jury's use of a requested video tape that was played in front of the parties in open court. Unlike the present case, where the requested exhibits had been admitted, the exhibit in *Sturma* had not been admitted but had previously been viewed by the jurors. We held that there was no showing "how the re-viewing of the tape by the jury during deliberations affected [the defendant's] substantial rights or denied him fundamental due process" because the jury "had already seen the brief tape once before, without objection," and the parties had treated the exhibit as admitted throughout trial. *Id.* And there was no discussion about fundamental error in allowing review of only the requested exhibit instead of all of them. Here, we conclude that the court did not abuse its discretion by allowing the jury during deliberations to review the requested, previously

viewed, and admitted exhibits, in open court while being monitored by the trial court and the parties.

[23] And the cases cited by the parties, those using the three factors to evaluate the trial court's decision to allow the jury to view exhibits *in the jury room*, support our decision that the court here did not abuse its discretion by monitoring the jury's review of the exhibits in *open court*. As to the first factor, "if the jury requests particular pieces of information, presumptively that information will aid the jury in proper consideration of the case." *Hall v. State*, 897 N.E.2d 979, 983 (Ind. Ct. App. 2008). Where an abuse of discretion has been found, it was because the trial court allowed the jury to review the requested materials without supervising them, a factor not present here. *See Powell v. State*, 644 N.E.2d 855, 858 (Ind. 1994) (case where statute applied but error to allow jury to review materials unsupervised); *Mays v. State*, 907 N.E.2d 128, 133 (Ind. Ct. App. 2009) (error to send video and player to jury room without monitoring use), *trans. denied*; *Hall*, 897 N.E.2d at 984 (error to send sound recording and equipment to jury room without supervision); *Stokes,* 801 N.E.2d at 1270 (error to allow jury to review videotape without monitoring its use); *Goodrich v. Ind. Michigan Power Co.*, 783 N.E.2d 793, 798 (Ind. Ct. App. 2003) (abuse of discretion to send exhibit to jury room), *trans. denied*.

[24] Because we conclude there was no error, we need not address whether fundamental error occurred.

## Conclusion

[25] In light of the foregoing, we affirm the trial court's judgment.

Altice, C.J., and Bailey, J., concur.